# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| XMISSION, L.C.,<br><br>    Plaintiff,<br><br>vs.<br><br>CLICK SALES, INC.,<br><br>    Defendant. | MEMORANDUM DECISION AND PRELIMINARY INJUNCTION ORDER<br><br>Case No. 2:17CV1287DAK<br><br>Judge Dale A. Kimball |

    This matter is before the court on Defendant Click Sales, Inc.'s Motion to Dismiss First Amended Complaint for Lack of Personal Jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure and Plaintiff XMission L.C.'s Renewed Motion for Preliminary Injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. On March 8, 2019, the court held a hearing on the motions. At the hearing, Plaintiffs were represented by Jordan K. Cameron and Defendant was represented by Tyler G. Newby and Brian E. Lahti. The court took the motion under advisement. After carefully considering the memoranda filed by the parties and the law and facts relevant to the pending motion, the court issues the following Memorandum Decision and Order.

## BACKGROUND

    XMission is a Utah-based Internet Service Provider, ("ISP") founded in 1993, which has offered a variety of Internet connectivity services throughout the years. XMission owns all the hardware through which it offers its services, and its hardware is located in Utah. XMission has had to consistently upgrade its hardware to deal with spam problems. Throughout the years,

XMission has also expended significant sums of money, bandwidth, technological resources, and employee time and resources to deal with the problems spam causes.

Click Sales is a Delaware corporation with its principal place of business in Boise, Idaho. Click Sales does business as ClickBank and operates an online marketplace and affiliate marketing program. Because Click Sales does business as ClickBank, the court will refer to Click Sales as ClickBank throughout this order. ClickBank's online marketplace allows third-parties to sell their products on the ClickBank platform. ClickBank does not sell its own products on the ClickBank website. By operating the ClickBank online marketplace, Click Sales facilitates and processes purchases between buyers visiting the website and the vendors offering their products for sale on the ClickBank website. ClickBank charges a fee for processing the transaction.

ClickBank's affiliate marketing program is designed to drive traffic to websites promoting various ClickBank offers. Third-party affiliates create accounts with ClickBank in order to promote offers on ClickBank's website in exchange for commission payments. ClickBank's website explains the process: "1. You find a product to promote and create a customized HopLink. 2. You promote the product online. 3. A customer clicks on your HopLink, goes to the vendor's website, and ends up purchasing the product from ClickBank. 3. You receive credit for promoting the sale. Your commission is calculated based on the net sale price . . . and credited to your account within two minutes of the sale."

A ClickBank "HopLink" is a link used to direct traffic to ClickBank offers and to track the affiliates' traffic for commission purposes. A HopLink can exist in two forms: (1) an encrypted HopLink that does not identify the vendor or affiliate to the public, or (2) a readable HopLink that includes the vendor and affiliate names in the link. ClickBank provides its

affiliates with the tools to encrypt HopLinks to ensure that the parties responsible for the emails are hidden from the public. Some affiliates choose to use encrypted HopLInks to prevent other third parties from interfering with their HopLinks, which may affect the record of their transactions and sale proceeds.

Each vendor selling its products on ClickBank's platform determines what percentage of the product's sale price it will share with the marketing affiliate for completed sales. ClickBank processes the orders and distributes sale proceeds to the vendor and the affiliate. ClickBank charges its own service fee to the vendor for processing the sale, as it does for sales completed without any affiliate promotion.

One of the ways ClickBank's affiliates transmit the HopLinks is through emails. The affiliates deliver HopLinks to prospective customers' in-boxes and drive traffic to ClickBank offers hosted on various websites. The websites identify ClickBank as the "retailer of products on this site." If a customer purchases a product, ClickBank earns its fee and pays a commission to the affiliate who transmitted the HopLink.

ClickBank requires its affiliates and vendors to abide by ClickBank's terms of service with respect to promotional activity, including a requirement that the vendors and affiliates comply with all federal and state laws and regulations. In order to determine that its affiliates are generating legitimate traffic to ClickBank's offers, "ClickBank will withhold payment of any balance until an account shows a minimum of 5 sales using at least two of the following payment methods: American Express . . . Discovery . . . MasterCard . . . Visa."

From 2015 to date, XMission has received over 116,000 commercial emails on its Utah servers promoting ClickBank that have contributed to a spam problem. Each of the emails contains "HopLinks" through which ClickBank is identified as the responsible party.

XMission's Terms of Service allow it to opt-out or unsubscribe from email traffic for its customers. Given the enormous number of ClickBank emails, XMission has used an automated system to attempt to click on available unsubscribe links in each of the emails. But the automated system has not appeared to have had any significant effect. In a recent declaration from ClickBank's Chief Technology Officer, it states that ClickBank does not have any mechanism to unsubscribe email addresses.

ClickBank claims that, with the exception of limited historical promotions for digital products about how to use ClickBank, ClickBank did not send emails promoting products listed on the ClickBank marketplace. ClickBank also does not review or approve of the emails its affiliates send in order to generate commissions within the ClickBank affiliate marketing program.

XMission has received 30,800 customer reports of spam from its customers in relation to the spam emails from ClickBank affiliates and ClickBank. XMission received nearly 2,000 customer reports of spam in June and July 2018, and nearly 60% of the ClickBank emails received on XMission's servers in July 2018 generated customer reports of spam.

In July 2018, XMission filed the present case against ClickBank alleging that all of the ClickBank emails violate provisions of the Controlling the Assault of Non-Solicited Pornography and Marketing Act ("CAN-SPAM"), 15 U.S.C. §§ 7701-7713. After XMission filed its original motion for preliminary injunction, it stipulated to stay a hearing on the motion based on ClickBank's representation that it would mediate the matter. When it became clear to XMission that ClickBank had changed its position on mediation, XMission renewed its motion for preliminary injunction.

# DISCUSSION

Because "personal jurisdiction is a prerequisite to granting injunctive relief," the court will address ClickBank's motion to dismiss first. *National Union Fire Ins. Co. v. Kozeny*, 115 F. Supp. 2d 1231, 1236 (D. Colo. 2000) (citing *Citizens Concerned for Separation of Church and State v. City and County of Denver*, 628 F. 2d 1289, 1299 (10th Cir. 1980)).

## **ClickBank's Motion to Dismiss for Lack of Personal Jurisdiction**

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, ClickBank moves to dismiss XMission's Complaint for lack of personal jurisdiction over ClickBank in Utah. XMission has the burden of demonstrating that the court has jurisdiction over ClickBank. *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011).

To defeat a motion to dismiss, a plaintiff must make a prima facie showing of personal jurisdiction. *Old Republic Ins. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017). The court accepts the well-pled allegations of the plaintiff's complaint as true unless the defendant contradicts those allegations in affidavits. *Kennedy v. Freeman*, 919 F.2d 126, 128 (10th Cir. 1990). If the parties submit conflicting affidavits, the court resolves any factual disputes in the plaintiff's favor. *Id.* In this case, the parties dispute whether the Declaration of Peter Ashdown contains admissible evidence. But the evidence provided in the Declaration is based on his personal observations, and the court has wide discretion in allowing evidence at this early stage of the litigation. To the extent that ClickBank seeks to have the court exclude portions of the Ashdown Declaration, the request is denied.

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Utah's long-arm statute extends jurisdiction to the fullest extent allowed by the Due Process Clause of the Fourteenth

Amendment and is, therefore, coextensive with the due process analysis under the United States Constitution. Utah Code Ann. § 78B-3-201(3). Under the due process clause, A court may exercise jurisdiction over a defendant if (1) the defendant purposefully established "minimum contacts" with the forum, and (2) the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice. *Old Republic*, 877 F.3d at 903.

A defendant's contacts may subject it to either general or specific jurisdiction in a forum. *Id.* A defendant is subject to general jurisdiction in a forum when its contacts "are so constant and pervasive 'as to render [it] essentially at home in the forum State.'" *Daimler*, 571 U.S. at 122. XMission states that it does not have sufficient information at this time to address general jurisdiction. Accordingly, the court will consider only whether this forum has specific jurisdiction over ClickBank.

Specific jurisdiction is case-specific. *Old Republic*, 877 F.3d at 904. Courts in the Tenth Circuit conduct a three-part analysis when considering specific jurisdiction: (1) whether the defendant purposefully directed its activities at residents of the forum state; (2) whether the plaintiff's claims arise out of those activities; and (3) whether exercise of jurisdiction would be unreasonable. *Id.*

The purposeful direction test ensures that an out-of-state defendant "'will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, . . . or of the unilateral activity of another party or a third person.'" *Id.* at 904-05 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). An out-of state defendant's activities can satisfy the purposeful direction requirement under at least three frameworks: "(1) continuing relationships with forum state residents ('continuing relationships'); (2) deliberate exploitation of the forum state market ('market exploitations') and (3) harmful effects in the forum state ('harmful

6

effects').") *Id.* at 905. The latter two frameworks have been extended to "cases involving internet content." *Id.*

The United States Supreme Court addressed the harmful effects method for finding purposeful direction in *Calder v. Jones*, 465 U.S. 783, 790-91 (1984). In *Old Republic,* the Tenth Circuit explained that purposeful direction exists under *Calder* where (1) the defendant commits an intentional act, (2) that is expressly aimed at the forum state, (3) with knowledge that there will be harmful effects in the forum state. 877 F.3d at 907.

ClickBank argues that XMission has not alleged any plausible facts demonstrating that ClickBank purposefully directed the alleged spam emails into Utah. XMission, however, contends that ClickBank has purposefully directed emails to XMission's customers in Utah in at least two ways. First, ClickBank creates and sends emails promoting some of its own ventures, such as ClickBank University, directly to XMission customers in Utah. Although ClickBank argues that ClickBank's direct emails are not spam, XMission alleges that the emails violate CAN-SPAM because XMission requested that its customers be unsubscribed from the emails and ClickBank continued to send them.

ClickBank asserts that XMission did not include a specific claim in its Amended Complaint relating to emails directly from ClickBank, such as the ClickBank University emails. However, XMission's Amended Complaint alleges that ClickBank sent emails into Utah that were violations of CAN-SPAM and that some of those emails violated 15 U.S.C. § 7704(a)(4) and (5), which preclude the sending of emails after an objection and for failing to give a clear method for unsubscribing. Am. Compl. ¶¶ 4, 5. In addition, XMission submitted the Declaration of Peter L. Ashdown, which states that ClickBank has sent over 116,000 spam emails to XMission's customers in Utah through XMission's servers, XMission has used an automated

7

system to attempt to unsubscribe from those emails, and the unsubscribe system has had no effect. *See OMI Holdings, Inc. v. Royal Ins. Co.*, 149 F.3d 1086, 1091-92 (10th Cir. 1998) (plaintiff must demonstrate "via affidavit or other written materials, facts that if true" would support jurisdiction over defendant). The Amended Complaint and the Ashdown Declaration, which the court can rely on for purposes of deciding a jurisdictional motion, are sufficient to demonstrate that some of XMission's CAN-SPAM claims arise out of emails ClickBank intentionally sent to XMission's customers in Utah through XMission's servers in Utah.

XMission has also submitted evidence that it has repeatedly notified ClickBank of alleged CAN-SPAM violations relating to XMission's customers in Utah. Moreover, XMission has an automatic unsubscribe system that notified ClickBank of its customers' desires to unsubscribe to future ClickBank emails. The nature of XMission's CAN-SPAM claims against ClickBank for allegedly violating the unsubscribe request by sending subsequent emails to its Utah customers, necessarily alleges that ClickBank knew it was sending those subsequent emails into Utah. Therefore, even if ClickBank contends that it sends ClickBank University emails indiscriminately to every state in the nation and therefore no state in particular, such an email sent to a Utah customer after that Utah customer has requested no further such emails is "directed" at Utah because ClickBank is already on notice not to send the email to that customer in Utah. Accordingly, the court finds that ClickBank purposefully directed these subsequent emails to Utah and such emails can form the basis for XMission's CAN-SPAM causes of action against ClickBank in Utah.

Because this case involves emails sent directly from ClickBank, instead of only emails it may have enabled or encouraged third-party affiliates to send, the case is similar to *Zoobuh, Inc. v. Savicom, Inc.*, Case No. 2:17-cv-1098JNP, 2018 WL 2768665 (D. Utah June 8, 2018), and

distinguishable from *Zoobuh, Inc. v. Williams*, Case No. 2:13-cv-791TS, 2014 WL 7261786 (D. Utah Dec. 18, 2014). As in *Savicom*, XMission has alleged that ClickBank directly sent emails to Utah and that some of XMission's CAN-SPAM claims arise out of those emails. The alleged failure to unsubscribe the email recipient from future emails allegedly caused harm to XMission and its customers in Utah. Even if the bulk of XMission's CAN-SPAM claims relate to emails from third-party affiliates, the existence of some claims arising out of ClickBank's intentionally sent emails is sufficient for this court to exercise jurisdiction.

"Once the first two requirements are established, the court may exercise jurisdiction over the defendant unless the defendant presents a 'compelling case' that the presence of some other consideration renders jurisdiction unreasonable." *Savicom*, 2018 WL 2768665 at *8. In determining such reasonableness, the court considers factors such as "'(1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies.'" *Id.* (quoting *Old Republic*, 877 F.3d at 909).

In this case, because ClickBank argued that its direct emails to Utah did not form the basis of XMission's CAN-SPAM claims, ClickBank did not even argue or attempt to make a "compelling case" that jurisdiction over it in this district is unreasonable. The court notes, however, that litigating this case in Utah would appear to place little to no burden on ClickBank. Although this case requires ClickBank to litigate this case in Utah rather than Idaho, ClickBank's chosen attorney is from California, not Idaho. The witnesses and documents relevant to the case should be evenly split between ClickBank principal place of business in Idaho and XMission's principal place of business in Utah. The federal courts in Idaho and Utah would equally apply

the federal CAN-SPAM act, and both jurisdictions equally have an interest in providing a fair forum for its corporate residents. In this dispute, however, Utah has a particular interest in providing effective and convenient relief to a resident alleging harm in that resident's chosen forum. ClickBank has not presented any argument to overcome that interest. Therefore, the court finds that ClickBank has provided no basis for determining that this court's exercise of jurisdiction over ClickBank in Utah is unreasonable.

While XMission seeks a ruling from this court on whether ClickBank intentionally sent the emails sent by third-party affiliates, the court need not address that issue given ClickBank's own direct emails sent into Utah that are potential CAN-SPAM violations.

### XMission's Motion for Preliminary Injunction

XMission moves this court to preliminarily enjoin ClickBank and its affiliates from sending XMission and its customers commercial emails that violate the CAN-SPAM Act.

## I. Preliminary Injunction Standard

A preliminary injunction is an "extraordinary and drastic remedy." *Warner v. Gross*, 776 F.3d 721, 728 (10th Cir. 2015). Preliminary injunctive relief is appropriate if the moving party establishes: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *Roda Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). In *Dine Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016), the Tenth Circuit applied the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), and explained that "[u]nder *Winter's* rationale, any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." *Id.*

Because a preliminary injunction is an extraordinary remedy, the "right to relief must be clear and unequivocal." *SCFC LLC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991). However, in *Heideman v. South Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003), the court recognized that "'[a] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.' *University of Texas v. Camenisch*, 451 U.S. 390 (1981). A hearing for preliminary injunction is generally a restricted proceeding, often conducted under pressured time constraints, on limited evidence and expedited briefing schedules. The Federal Rules of Evidence do not apply to preliminary injunction hearings." Moreover, "[t]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at the trial on the merits." *Attorney General of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769 (10th Cir. 2009).

In the Tenth Circuit, certain types of injunctions are disfavored: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Schrier v. University of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005) (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004)). "Such disfavored injunctions 'must be more closely scrutinized to assure that the exigencies of that case support the granting of a remedy that is extraordinary even in the normal course.'" *Id*.

ClickBank contends that XMission is seeking a disfavored mandatory injunction by seeking an order requiring ClickBank to affirmatively act in a particular way that may require the court's supervision. An injunction is mandatory if it will "affirmatively require the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may

11

have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." *Id.* at 1261. The Tenth Circuit has recognized that "[t]here is no doubt that determining whether an injunction is mandatory as opposed to prohibitory can be vexing." *O Centro*, 389 F.3d at 1006. "'In many instances, this distinction is more semantical than substantive. For to order a party to refrain from performing a given act is to limit his ability to perform any alternative act; similarly, an order to perform in a particular manner may be tantamount to a proscription against performing in any other.'" *Id.* (citation omitted).

In this case, XMission's requested injunction asks the court to prohibit ClickBank from sending emails to XMission customers that violate CAN-SPAM. ClickBank claims that the injunction goes beyond the bounds of CAN-SPAM and prohibits it and its affiliates from sending any commercial emails. However, that is precisely what the unsubscribe feature is intended to allow. XMission has an automated unsubscribe feature that has requested that the customer be unsubscribed from all future emails. ClickBank and its affiliates who receive those request are obligated under CAN-SPAM to honor the unsubscribe request. The court does not find the requested injunction to mandate a particular action. Rather, the requested injunction is a standard injunction prohibiting ClickBank and its affiliates from violating the law. Accordingly, the court finds no basis for applying heightened scrutiny to XMission's requested injunction.

**A. Irreparable Harm**

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *New Mexico Dep't of Game & Fish v. United States Dep't of Interior*, 854 F.3d 1236, 1249 (10th Cir. 2017). Therefore, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Id.*

Under Tenth Circuit law, "[i]rreparable harm is not harm that is merely serious or substantial. . . . The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman*, 348 F.3d at 1189. "The question is not just whether [plaintiff] faces a concrete and imminent injury, but whether such an injury will be irreparable without the injunction." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). "A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001).

As an initial matter, Clickbank argues that XMission's delay in pursuing its injunction undercuts its claim of irreparable harm. XMission filed its First Amended Complaint against ClickBank and then pursued settlement discussions for six months. ClickBank argues that doing business under the status quo while engaging in settlement discussion is not the actions of a party suffering irreparable harm. While this court has denied preliminary injunctions based on delay, it has never done so when the delay is based on a party pursuing a settlement. A negotiated settlement that could resolve the dispute would typically be an efficient endeavor. Although it was not successful in this case, the time spent toward such resolution was not unduly long or unreasonable. The court agrees that "[t]ime spent in attempting to resolve a dispute is not counted towards laches because 'settlement of legal disputes is a highly favored course of conduct for which a party should be rewarded, not penalized." McCarthy on Trademarks and Unfair Competition § 31:15 (citation omitted); *Cramer Products, Inc. v. International Comfort Products, Ltd.*, No. 89-2488-0, 1989 WL 163012, *10 (D. Kan. Dec. 27, 1989) (unpublished) (holding that time spent negotiating not subject to laches and does not preclude injunctive relief).

Next, ClickBank argues that XMission has made only conclusory allegations that it will suffer reputational harm if its customers continue to receive alleged spam. This argument, however, ignores the full nature of XMission's allegations and the direct evidence XMission submitted from one of its customers. XMission alleges that if ClickBank and its affiliates are allowed to continue sending their sophisticated spam emails, it will lose its competitive position in the Utah market which is based on its historic ability to protect customers from spam.

XMission provided evidence that it has spent increasing amounts of money on hardware, technology, and employees over the years to combat the spam problem as it has grown. XMission's inability to prevent ClickBank's sophisticated spamming practices causes an immediate and incalculable (1) loss of goodwill with XMission and its customers, (2) loss of the customer's business, (3) loss of potential future customers based on customer referrals, and (4) loss of its reputation in the marketplace. This type of loss to goodwill and reputation is precisely the type of harm courts find irreparable because it is difficult to calculate and fully recompense. *See Dominion Video v. Echostar Sat. Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004) (finding "factors supporting irreparable harm" to include "inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace").

XMission has also submitted evidence that it has received over 30,800 customer spam reports arising as a result of ClickBank and ClickBank affiliate emails. This is a substantial number of complaints. *See MySpace Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1304-05 (C.D. Cal. 2007) (finding 800 complaints from users was substantial number of complaints and constituted injury to plaintiff's goodwill). In addition, XMission submitted the declaration of a customer stating that ClickBank spam emails had caused her to lose faith in XMission's ability to protect her. XMission alleges that one of its imponderable qualities as a business is its ability to protect

customers from unwanted and misleading commercial emails as well as its ability to provide a safe and efficient email platform. Under CAN-SPAM, an individual email recipient does not have a private right of action. 15 U.S.C. § 7706. Only XMission, as a bona fide internet access service provider, may bring a civil action to protect its individual customers. *Id.* § 7706(g)(1). Although XMission expends time and money to provide the type of services its customers desire, XMission alleges that ClickBank has developed sophisticated practices to bypass XMission's efforts to protect its customers from spam and ClickBank's practices pose a threat to XMission's ability to maintain its competitive position in the marketplace. There is direct evidence of customer complaints and loss of goodwill but there is no way to ascertain the number of lost customers or potential customers as a result of the spam emails. ClickBank argued that there is no allegation that XMission will go out of business as a result of the spam emails, but that is not the standard for a finding of irreparable harm.

The court finds that XMission's direct evidence and the inferences reasonably drawn from it demonstrate a threat of imminent irreparable harm to XMission. Accordingly, the court concludes that XMission has met this essential element for the issuance of a preliminary injunction.

**B.  Likelihood of Success on the Merits**

XMission argues that it is likely to succeed on the merits of its CAN-SPAM Act claims. The CAN-SPAM Act allows an email recipient to opt out of receiving commercial emails from any sender. 15 U.S.C. § 7704(a)(4). If such a request is made, then it is unlawful for the sender to send or assist in initiating the transmission of a commercial email to that recipient. *Id.* § 7704(a)(4)(A)(I)-(iii). XMission's customers have given XMission authority to exercise their opt-out rights for them.

XMission also claims several CAN-SPAM violations based on false or misleading headers. The CAN-SPAM Act makes it unlawful for any person to initiate the transmission of a commercial email that contains, or is accompanied by, header information that is materially false or misleading. *Id.* § 7704(a)(1). "[H]eader information that is technically accurate but includes an originating . . . domain name . . . the access to which for purposes of initiating the message was obtained by means of false or fraudulent . . . representations shall be considered materially misleading." *Id.* § 7704(a)(1)(A). In addition, XMission claims violations of the CAN-SPAM Act requirement that every commercial email contain "a valid physical postal address of the sender." *Id.* § 7704(a)(5)(A)(iii). The sender is defined as the party whose product, service, or website is promoted by the message. *Id.* § 7702(16)

As an initial matter, XMission clearly has standing to bring its claims under CAN-SPAM. As explained above, XMission's customers have no private right of action under CAN-SPAM, only a bona fide internet access service provider can bring an action. XMission has provided evidence that it is a bona fide internet access service provider, it has invested increasing amounts of its resources to combat the spam email problem, and it has received a significant number of complaints from its customers regarding the spam emails. Therefore, it has met any standing requirements to bring this suit. *See Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1055 (9th Cir. 2009).

XMission has presented evidence that it has opted out of every email it has received from ClickBank and its affiliates and the emails should have stopped in 2015. The Ashdown Declaration explains that XMission has an automated opt-out system to opt-out of all of the emails in question. The opt-out provision of CAN-SPAM applies to all commercial emails, not just spam emails. Because XMission has opted out of all ClickBank and its affiliates commercial

emails, XMission's customers should not continue to receive emails from ClickBank or its affiliates. Therefore, XMission has shown a likelihood of success on the merits of its opt-out claims against ClickBank for continuing to send commercial emails.

The parties dispute whether XMission can demonstrate a likelihood of success on the merits on its opt-out and misleading header claims against ClickBank based on the emails sent from ClickBank affiliates. ClickBank claims that it is not responsible for its affiliates' emails. Whereas, XMission argues that ClickBank is responsible for its affiliates' emails because it established and oversees the affiliate program and CAN-SPAM has a broad definition of initiator.

Under CAN-SPAM, an "initiator," "when used with respect to a commercial electronic mail message," is one who "originate[s] or transmit[s] such message or . . . procure[s] the origination or transmission of such message. 15 U.S.C. § 7702(9). A party "procures" the origination or transmission of commercial emails when it "intentionally pay[s] or provide[s] other consideration to, or induce[s], another person to initiate such a message on one's behalf with actual knowledge, or by consciously avoiding knowing, whether such person is engaging, or will engage, in a patter or practices that violates this chapter." *Id.* §§ 7702(12), 7706(g)(2).

ClickBank argues that although it operates the marketplace and marketing program, it does not send or cause any of the affiliates to send an email. Under the affiliate marketing program, the affiliate needs to include a ClickBank Hoplink in its message in order for ClickBank to track the affiliates compensation for any sales the affiliate generates. However, ClickBank argues that the affiliate can choose to embed the HopLink into a any type of social media transmission the affiliate chooses to employ to reach out to potential consumers, be it a tweet, post, or email. This argument, however, ignores the fact that ClickBank knows that some

of its affiliates are employing mass emails to transmit its HopLink and both ClickBank and the affiliate profits from any resulting sale related to that HopLink. The emails would never be sent out absent ClickBank's marketplace, marketing program, and HopLink.

Moreover, XMission has submitted evidence that ClickBank has been receiving notice of CAN-SPAM violations based on affiliates' emails since a lawsuit in 2003 and a letter XMission sent to ClickBank in 2012. ClickBank argues that it does not have a basis for overseeing every email an affiliate sends and its contract with affiliates requires its affiliates to comply with the law. However, ClickBank does admit that it has taken punitive actions against some affiliates for their email practices. This admission demonstrates the control ClickBank can exercise over its affiliates if it so chooses. The contract is not a basis for avoiding knowledge of its affiliates' spam practices, especially given the notice of violations ClickBank has received over the years.

ClickBank claims that its contract with affiliates insulates it from CAN-SPAM liability. However, the court agrees with XMission that the contract may be a mitigating factor for damages but it is not a defense to whether ClickBank procured the emails. Given the broad definition of initiator under CAN-SPAM, the court concludes that, based on the evidence presently before the court, ClickBank likely falls within the definition of initiator with respect to its affiliates' emails.

XMission has also submitted several examples of emails it alleges are spam emails form ClickBank's affiliates to XMission customers. XMission specifically demonstrated how the email is not from the entity it claims to be from in the email's header. Therefore, the emails in the record presently before the court appear to be violations of CAN-SPAM. Accordingly, the court concludes that XMission has demonstrated a likelihood of success on the merits of its CAN-SPAM claims against ClickBank.

### C. Balance of Harms & Public Interest

In this case, XMission is seeking relief from spam emails for itself and its customers. XMission has submitted evidence that it has expended substantial resources and time into combating the spam emails from ClickBank and its affiliates. In addition, XMission has submitted evidence that its customers have sent over 30,000 complaints regarding ClickBank's and its affiliates' emails. Moreover, given XMission's attempts at opting out of all these emails, it should not need to be dealing with this issue.

ClickBank contends that XMission's proposed injunction would violate its First Amendment rights. However, XMission's injunction merely seeks to force ClickBank's compliance with the CAN-SPAM Act. ClickBank contends that the injunction would prevent it from sending a confirmation email to XMission customers if they purchased something on its marketplace. But the injunction prohibits only commercial emails as defined in the CAN-SPAM Act and a confirmation email would not be prohibited. ClickBank's free speech is not infringed by an injunction that merely enforces the provisions of the CAN-SPAM Act.

Furthermore, XMission's efforts to stop spam and unwanted emails for itself and its customers is within the public interest. XMission's request does nothing more than force compliance with a federal law enacted for the benefit of the public. For this reasons, the court also concludes that no bond is necessary. Therefore, the court concludes that XMission has met all four elements for the issuance of a preliminary injunction against ClickBank on its CAN-SPAM claims.

### CONCLUSION & PRELIMINARY INJUNCTION ORDER

Based on the above reasoning, Defendant ClickBank's Motion to Dismiss for Lack of Personal Jurisdiction [Docket No. 49] is DENIED, and Plaintiff XMission's Renewed Motion for

Preliminary Injunction [Docket No. 34] is GRANTED. Having granted XMission's Motion for Preliminary Injunction, the court orders that Defendant Click Sales, Inc. and all persons acting in concert or participation with it, including its affiliates, are enjoined from sending any commercial emails to XMission and/or any of its customers in violation of the CAN-SPAM Act.

DATED this 11th day of April, 2019.

BY THE COURT:

_____
DALE A. KIMBALL,
United States District Judge