**Jordan K. Cameron (12051)**
 jcameron@djplaw.com
**DURHAM JONES & PINEGAR, P.C.**
3301 N Thanksgiving Way, Suite 400
Lehi, Utah 84043
Telephone: (801) 375-6600
Fax: (801) 375-3865

**Attorneys for Plaintiff XMission, L.C.**

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XMISSION, L.C., a Utah company,<br><br>Plaintiff,<br><br>vs.<br><br>CLICK SALES, INC (dba CLICKBANK), a Delaware Corporation, DOES 1-20,<br><br>Defendants. | **RESPONSE TO MOTION FOR STAY PENDING APPEAL [ECF 73]**<br><br><br><br>Case No.: 2:17cv01287 EJF<br><br>Judge Dale A. Kimball |

COMES NOW Plaintiff XMission, L.C. ("XMission"), and respectfully submits this

*Response to Motion for Stay Pending Appeal* [ECF 73].

## ARGUMENT

I.  LEGAL STANDARD

Courts considers four factors in determining whether to grant a stay pending appeal: "[1] the likelihood of success on appeal; [2] the threat of irreparable harm if the stay or injunction is not granted; [3] the absence of harm to opposing parties if the stay or injunction is granted; and [4] any risk of harm to the public interest." *McClendon v. City of Albuquerque*, 79 F.3d 1014, 1020 (10th Cir. 1996). If the last three factors—known as the "harm factors"—weigh strongly in

Defendants favor, the Court may relax the standard of likelihood of success by asking whether the Defendant's appellate questions are "so serious, substantial, difficult and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Kobach v. U.S. Election Assistance Com'n*, 2014 WL 1806703, * 1 (D. Kan. May 7, 2014). However, Defendant bears the burden of demonstrating that a stay is appropriate under the circumstances. *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). Moreover, while the above factors inform the Court's decision, granting a stay is "entirely discretionary." *Kobach*, 2014 WL 1806703 at *1 (citing *Law v. NCAA*, 134 F.3d 1025, 1030 (10th Cir. 1998).

II. A STAY OF THE COURT'S PRELIMINARY INJUNCTION IS NOT APPROPRIATE

While the purpose of a stay pending appeal is to preserve the status quo, preserving the status quo in this case means allowing Defendant to continue to inundate XMission and its customers with hundreds, if not thousands, of spam emails in violation of the federal CAN-SPAM Act, which emails XMission has demonstrated have caused (and will likely continue to cause) irreparable harm to it. As described further below, Defendant cannot satisfy its burden on any of the four stay factors. Therefore, the Court should not enter a stay allowing Defendant to continue to blatantly violate federal law.

   A. **Defendant does not face any irreparable injury because the *Injunction* merely requires that Defendant comply with the law.**

Defendant's claims that it will be irreparably harmed by the *Injunction* because it violates the First Amendment and improperly subjects Defendant to contempt sanctions have no merit. The Court addressed Defendant's First Amendment argument in its *Order*, properly finding that "[Defendant's] free speech is not infringed by an injunction that merely enforces the provisions

2

of the CAN-SPAM Act." *See* ECF 19. In short, Defendant's illegally sent commercial emails are not afforded protection by the First Amendment.

To this point, Defendant sets forth the novel argument that XMission is not allowed to opt-out of receiving Defendant's emails on behalf of its customers, rendering Defendant's emails legal and constitutionally protected. *See* ECF 9–10. Yet it provides no authority supporting this unreasonable interpretation of the Act. Defendant cites to *F.T.C. v. Mainstream Marketing Services., Inc.* for its proposition that each email recipient is required to choose for themselves to opt-out of receiving Defendant's emails. *See* ECF 73 at 9–10. However, its reliance on this case is misplaced, as the case's ultimate holding supports the opposite conclusion. In *Mainstream Marketing*, the Court analyzed the constitutionality of new FTC regulations establishing a federal do-not-call registry. 345 F.3d 850, 853–854 (10th Cir. 2003). Private citizens could have their names placed on this registry and the FTC, in turn, would prohibit any telemarketers from contacting them. See *id*. While the Tenth Circuit did mention in its analysis that restrictions on commercial speech depend "in part on the existence of private choice," it ultimately held that these regulations did not violate the First Amendment. *Id.* at 855, 860. Although, under the FTC regulations, citizens did not decide against receiving calls from each telemarketer individually, the Court reasoned that invoking the help of the do-not-call registry "provide[d] an element of private choice." *See id.* at 860.

Similarly here, XMission customers invoke the help of XMission and its spam mitigation practices by granting XMission the authority to opt-out of receiving emails on their behalf, providing the requisite "private choice." *See XMission Terms of Service*, https://xmission.com/legal_terms (last accessed May 15, 2019). Moreover, XMission customers

have the choice to opt-out from XMission's spam mitigations services. *See id*. ("If you do not wish to have your email address(es) included in the SPAM mitigation effort, it is your responsibility to contact XMission . . . and opt-out."). In other words, XMission customers exercise their personal choice regarding their desire to globally opt-out from spam email, or to receive it and address it on their own. None of the emails in question were sent to customers who elected not to participate in XMission's suppression services.

Even accepting Defendant's argument as true, it would not be dispositive to this issue. XMission has presented evidence—which the Court relied on in granting in the injunction—that Defendant's emails violate the CAN-SPAM Act in other ways, including using false header information. Therefore, Defendant's emails would still not be protected by the First Amendment.

Regarding Defendant's second argument that the *Injunction*'s terms are overly vague, Rule 65(d) "requires only that the enjoined conduct by described in reasonable, not excessive, detail—particularly in cases . . . when overly precise terms would permit the very conduct sought to be enjoined." *See Clear One Commmunications, Inc. v. Chiang*, 670 F. Supp. 2d 1248, 1282–83 (D. Utah 2009). The Court's *Injunction* gives a simple and clear instruction for Defendant and its affiliates to cease sending commercial emails to XMission customers in violation of CAN-SPAM. Defendant insists that this instruction is overly vague because it "does not specify in reasonable detail any means by which Click Sales can comply." *See* ECF 73 at 12. However, it is not the Court's duty to give parties step-by-step instructions on how to comply with its orders. Defendant's argument that it has no control over its affiliates is equally unavailing. This situation is analogous to an injunction preventing a company to take certain actions. Certainly, the company does not have literal control over all of its employees' behavior, and the employees can

violate the terms of an injunction if they so choose. However, the company is not absolved from compliance with court orders; it must impose regulations and disciplinary action to ensure compliance. Similarly, Defendant is responsible for ensuring that its employees, affiliates, and all those acting in concert with it adhere to the *Injunction*—or otherwise cease affiliation with those who will not comply. As the Court recognized in its *Order*, Defendant has demonstrated the "control [it] can exercise over its affiliates if it so chooses." ECF 67 at 18.

Further, Defendant's argument is inconsistent with its prior position as set forth in its *Opposition to Renewed Motion for Preliminary Injunction*. *See* ECF 62. When facing the motion originally, Defendant did not argue that it could not comply with the proposed injunction (whose language was more onerous than the version entered by the Court), but simply, that compliance would cost around $49,000. *See* ECF 62 at 17-18 ("Click Sales would need to substantially modify its business operations and develop technology systems that it does not currently have to ensure that any commercial emails sent by its millions of accounts registered to vendors or affiliates are only sent through Click Sales' servers, allowing it to comply with Plaintiff's requested injunction. The cost to generate a plan for implementation, not counting any costs to build and maintain the platform, would cost at least $49,000.") (citations omitted). This is a nominal sum for a company the size of Defendant and is not irreparable harm. Accordingly, Defendant has not met its burden in showing that it faces irreparable harm in the absence of a stay.

**B.    XMission will incur significant harm if the *Injunction* is stayed.**

As this Court recognized in its *Order*, XMission incurs daily harm and faces irreparable injury from Defendant's actions. *See* ECF 67 at 19 (recognizing the evidence that XMission "has

5

expended substantial resources and time into combating spam emails from [Defendant] and its affiliates" and received over 30,000 complaints regarding [Defendant's' and its affiliates' emails"). The fact that XMission may face similar harm from third parties' actions does not make this finding any less true. Further, there is no evidence of such harm in the record and Defendant's arguments are pure speculation. While it is true that "the injunction does not relieve XMission of the need to maintain the identified servers and filtering technology," (*See* ECF 73 at 14) it does eliminate the need to spend man hours identifying and addressing ClickBank emails which are particularly tricky and have caused unique harm to XMission. Further, Defendant's argument entirely this misconstrues the standard. It is not, as Defendant suggests, an analysis of the percentage of XMission's harm for which the Defendant is responsible; rather, the standard simply asks if there will be an "absence of harm to opposing parties if the stay or injunction is granted." *McClendon*, 79 F.3d at 1020. XMission and its customers have received over 400 ClickBank emails since the Court entered the *Injunction*. Tellingly, a number of these email were sent directly from Defendant (i.e., from email addresses containing the @clickbank.com or similar suffix). *See* Example Email included as Exhibit A hereto. Each of these emails contributes to the ongoing harm to XMission that this Court recognized in its *Order*. Therefore, XMission will undoubtedly be harmed even further if the *Injunction* were stayed, and not only by Defendant's affiliates, but by Defendant directly.

      The fact that the post-injunction emails include emails directly from Defendant belies the argument that Defendant's concern is with its ability to implement the order with respect to its affiliates. Simply, Defendant comes to the Court with unclean hands. Defendant appears to seek a stay so that it can continue to engage in unlawful conduct that is easily within its ability to stop.

### C. There is no risk of harm to public interest by maintaining the *Injunction*.

Denying a stay of the *Injunction* poses no risk to the public. Defendant again returns to the argument that the Court's *Injunction* prevents protected commercial speech in violation of the First Amendment. This argument is no more persuasive in Defendant's *Motion* than it was in its opposition to the *Injunction*. As discussed at length in Section II(A), Defendant's emails to XMission users are not constitutionally protected speech, so there is no public interest in staying the Court's order enjoining them.

While there is no risk of harm to the public by the *Injunction*, the opposite is true: staying the *Injunction* threatens the public interest by allowing Defendant to continue to blatantly violate the CAN-SPAM Act. As the Court recognized in its *Order*, "XMission's efforts to stop spam and unwanted emails for itself and its customers is within the public interest." *See* ECF 78 at 19. Accordingly, Defendant has not met its burden as to the public risk element.

### D. Defendant has not met its burden on the three harm factors sufficient to invoke the lesser "serious legal question" standard and has not shown a likelihood of success on the merits.

1. Defendant has not shown it is likely to succeed on the merits.

The Court only applies the "serious legal question" where the party has successfully demonstrated the three other "harm" factors. Although failing to show one factor would be sufficient to prevent the application of this lesser standard, Defendant has failed to meet its burden on any of the three factors. Moreover, Defendant has not made a showing that it is likely to succeed on the merits of its appeal.

Defendant's argument that it is likely to succeed on question of whether it "initiated" the emails at issue under the CAN-SPAM Act is, almost verbatim, the same argument it made in its

7

*Opposition to Plaintiff's Renewed Motion for Preliminary Injunction. See generally* ECF 62. The Court expressly addressed and rejected these arguments in its *Order*, finding that Defendant is likely an "initiator" under the Act and that the Court could properly exercise personal jurisdiction over Defendant. *See generally* ECF 67. For the same reasons set forth in the Court's *Order*, it should reject the arguments in Defendant's current *Motion*.

Similarly, Defendant's argument as to the likelihood of success on the issue of personal jurisdiction are the same arguments made in its *Motion to Dismiss the First Amended Complaint* (*see* ECF 49), all of which the Court rejected in its *Order*. Defendant does set forth one new argument regarding the legal principle of pendent jurisdiction in its *Motion*. *See* ECF 73 at 18–19. In sum, Defendant argues that XMission's claims involving emails sent directly from Defendant and those sent from Defendant's affiliates constitute separate claims, and that this Court could only possibly assert jurisdiction over the claims involving emails sent from Defendant. *See id.* However, the actual identify of the person who clicked send on the email is not what makes a "claim." The relevant inquiry is what party "initiated" the emails as defined by the CAN-SPAM Act. And further, the CAN-SPAM Act expressly states that more than one person can be considered to have initiated a single email. *See* 15 U.S.C. § 7702(9).

Here, XMission alleges that Defendant initiated all emails at issue—either by actually sending or by procuring their transmission—and therefore the claims are not separate for purposes of personal jurisdiction. Based on the above, Defendant has not satisfied its burden of demonstrating a likelihood of success on the merits of its appeal.

2. Alternatively, the legal questions posed by Defendant's appeal do not warrant a stay.

Assuming, *arguendo*, that the Court applies the lesser standard as to this factor, Defendant's appeal does not present a serious legal question that would warrant a stay. Defendant cites to two allegedly serious legal question for this factor. The first is whether a party initiates an email "where it does not originate or transmit the email, pay or provide consideration to induce another to do so, and lacks actual knowledge of the email." Defendant claims that the Court's *Order* finds Defendant to be an initiator "despite these circumstances." *See* ECF 73 at 14. However, the *Order* does not hold this in any way. The Court found both that Defendant provides its affiliates a means to profit from sending the illicit emails—i.e., through its affiliate program—and that Defendant had actual knowledge that these emails were reaching Utah since 2012. *See* ECF 67 at 17–18. This satisfies the explicit language of the CAN-SPAM Act and does not pose a serious legal question.

The second legal question Defendant proffers is whether "a district court may exercise specific personal jurisdiction over a defendant based only on emails received in the forum state." ECF 73 at 15. Defendant claims that the Tenth Circuit holding in *Shrader v. Biddinger* and the United States Supreme Court's holdings in *Walden v. Fiore* and *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.* directly contradict this Court's holding in the *Order*. *See id.* However, the Court's *Order* is entirely consistent with these holdings, and in fact is supported by the *Shrader* holding. *Walden* and *Bristol-Myers* involve physical conduct that the defendants conducted entirely in a different state. *See Walden*, 571 U.S. 277, 288–89 (finding that the defendant never "contacted anyone in, or sent anything or anyone to [the forum state]); *Bristol-Myers*, 137 S. Ct. 1773, 1782 (finding that the plaintiffs "are not [forum state] residents

9

and do not claim to have suffered harm in [the forum state]"). Moreover, the Tenth Circuit in *Shrader* held that emails sent to a plaintiff are sufficient to establish personal jurisdiction if the plaintiff also shows that "the defendant . . . knew where the recipient was located." 633 F.3d 1235, 1247–48 (10th Cir. 2011). The Court's exercise of personal jurisdiction over Defendant was based not only on Defendant's sending emails to XMission's users in Utah, but also on Defendant's knowledge that it was sending emails to Utah citizens. *See* ECF 67 at 8. Where the Court's holding on this issue does not violate established law, and is in fact supported by Tenth Circuit precedent, Defendant's legal question on appeal is not serious enough to warrant a stay.

Accordingly, Defendant has failed to meet its burden in either proving a likelihood of success on the merits or that its appeal poses a serious legal question such that this Court should grant a stay of the *Injunction*.

III. IF THE COURT DECIDES TO STAY THE INJUNCTION, IT SHOULD REQUIRE DEFENDANT TO POST A BOND IN THE AMOUNT OF AT LEAST ONE MILLION DOLLARS.

If this Court decides to grant Defendant's request for a stay, the Court should also require Defendant to post a bond in the amount of at least $1,000,000. Rule 62(d) allows the Court to grant a stay on "terms for bond or other terms that secure the opposing party's rights." Here, an appropriate bond to secure Plaintiff's rights pending appeal is the amount of the probable statutory penalty that applies to Defendant's continued conduct.

The CAN-SPAM Act assigns a different statutory penalty to different types of violations. XMission has alleged violations in the emails of various provisions of the statute including header violations (i.e. § 7704(a)(1)), content violations (i.e., § 7704(a)(5)), and opt-out violations (i.e., § 7704(a)(4)). Given the tens of thousands of emails received to date, and the fact that

emailing continues despite the *Injunction*, the statute entitles XMission to damages in an amount well in excess of $1,000,000. However, as the *Injunction* seems to address Defendant's failure to cease emailing, such claims are likely governed by 7704(a)(5), which damages are capped at $1,000,000 (excluding a finding of aggravated damages which allows trebling). *See* 15 U.S.C. § 7706 (g)(3)(B). While damages for the emails (when including header and content violations and aggravating factors (e.g., violation of an *Injunction*)) will far eclipse $1,000,000, a bond of at least $1,000,000 is reasonable.

## CONCLUSION

Based on the foregoing reasons, Plaintiff requests that this Court deny Defendant's *Motion for Stay Pending Appeal* or, alternatively, require that Defendant post bond in the amount of at least $1,000,000 to obtain a stay.

DATED this 21st day of May 2019.

DURHAM JONES & PINEGAR, P.C.

/s/ Jordan K. Cameron
Jordan K. Cameron
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

  I certify that on this 21st day of May, 2019, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system and/or email which sent notification of such filing to the following:

Jason A. McNeill
Brian E. Lahti
MCNEILL VONMAACK
175 South Main Street, Ste 1050
Salt Lake City, UT 84111

Tyler G. Newby
Sapna S. Mehta
FENWICK & WEST LLP
555 California Street
San Francisco, CA 94104

                /s/ Kim Altamirano
                Kim Altamirano